1    XAVIER BECERRA
     Attorney General of California
2    DAVID A. ZONANA
     Supervising Deputy Attorney General
3    DAVID G. ALDERSON, State Bar No. 231597
     Supervising Deputy Attorney General
4    GEORGE TORGUN, State Bar No. 222085
     TARA MUELLER, State Bar No. 161536
5    ERIN GANAHL, State Bar No. 248472
     Deputy Attorneys General
6      1515 Clay Street, 20th Floor
     P.O. Box 70550
7      Oakland, CA  94612-0550
     Telephone:  (510) 879-1002
8      Fax:  (510) 622-2270
     E-mail:  George.Torgun@doj.ca.gov
9

*Attorneys for Plaintiff State of California*

10    [Additional counsel listed on signature page]

MAURA HEALEY
Attorney General of Massachusetts
TURNER SMITH*
MATTHEW IRELAND*
Assistant Attorneys General
   Office of the Attorney General
   Environmental Protection Division
   One Ashburton Place, 18th Floor
   Boston, MA 02108
   Telephone:  (617) 727-2200
   Email:  Turner.Smith@mass.gov
   Email:  Matthew.Ireland@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

*Application for admission pro hac vice forthcoming*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF MARYLAND; STATE OF CONNECTICUT; STATE OF ILLINOIS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; and CITY OF NEW YORK,** | Case No. _____ |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | (Administrative Procedure Act, 5 U.S.C. §§ 551-59, 701-06; Endangered Species Act, 16 U.S.C. §§ 1531-44; National Environmental Policy Act, 42 U.S.C. §§ 4321-47) |
| **DAVID BERNHARDT, U.S. Secretary of the Interior; WILBUR ROSS, U.S. Secretary of Commerce; U.S. FISH AND WILDLIFE SERVICE; and NATIONAL MARINE FISHERIES SERVICE,** | |
| Defendants. | |

**INTRODUCTION**

1.      Plaintiffs State of California, by and through Xavier Becerra, Attorney General; Commonwealth of Massachusetts, by and through Maura Healey, Attorney General; State of Maryland, by and through Brian E. Frosh, Attorney General; State of Connecticut, by and through William Tong, Attorney General; State of Illinois, by and through Kwame Raoul, Attorney General; People of the State of Michigan, by and through Dana Nessel, Attorney General; State of Minnesota, by and through Keith Ellison, Attorney General; State of Nevada, by and through Aaron Ford, Attorney General; State of New Jersey, by and through Gurbir S. Grewal, Attorney General; State of New Mexico, by and through Hector Balderas, Attorney General; State of New York, by and through Letitia James, Attorney General; State of North Carolina, by and through Joshua H. Stein, Attorney General; State of Oregon, by and through Ellen Rosenblum, Attorney General; Commonwealth of Pennsylvania, by and through Josh Shapiro, Attorney General; State of Rhode Island, by and through Peter F. Neronha, Attorney General; State of Vermont, by and through Thomas J. Donovan, Jr., Attorney General; State of Washington, by and through Robert W. Ferguson, Attorney General; State of Wisconsin, by and through Joshua L. Kaul, Attorney General; and the City of New York, by and through James E. Johnson, Corporation Counsel (hereinafter collectively "State Plaintiffs") bring this action to challenge two recent final rules implementing the federal Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-44.  The first rule was promulgated by the Secretary of the Interior, acting through the U.S. Fish and Wildlife Service ("FWS"), and the Secretary of Commerce, acting through the National Marine Fisheries Service ("NMFS") (collectively, "the Services") to create a narrow definition of "habitat" for purposes of making critical habitat designations under Section 4 of the ESA.  *See* Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 85 Fed. Reg. 81,411 (Dec. 16, 2020) ("Habitat Definition Rule"). The second rule was promulgated only by the Secretary of the Interior, acting through FWS, to create a new process for excluding areas of critical habitat when making such designations.  *See* Endangered and Threatened Wildlife and Plants; Regulations for Designating Critical Habitat, 85 Fed. Reg. 82,376 (Dec. 18, 2020) ("Habitat Exclusion Rule") (together, the "Final Rules").

2.      Rushed to completion during the final months of the Trump administration, the Final Rules violate the ESA's plain language and conservation purposes, its precautionary approach to protecting imperiled species and critical habitat, its legislative history, and binding judicial precedent.  The Final Rules also lack any reasoned basis and are otherwise arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–59, 701–06. Moreover, the Services violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–47, by failing to consider and disclose the significant environmental impacts of their actions.

3.      The Habitat Definition Rule—jointly promulgated by FWS and NMFS purportedly to respond to the Supreme Court's decision in *Weyerhaeuser Co. v. FWS*, 139 S. Ct. 361 (2018)— adds a new definition of "habitat" to the Services' implementing regulations that bears no resemblance to, and is not a logical outgrowth of, the definition proposed by the Services.  85 Fed. Reg. 81,411.  The Habitat Definition Rule unlawfully and arbitrarily defines the term habitat, for purposes of designating critical habitat, to cover only areas that "*currently or periodically* contain[] the resources and conditions necessary to support one or more life processes of a species."  *Id.* at 81,421 (emphases added).  The definition thus fails to account for species' need to expand their current ranges or to migrate to currently unoccupied habitat in response to existential threats such as climate change and habitat destruction to ensure species recovery and survival as mandated by the ESA.  The definition also fails to account for the possibility of restoring habitat that may not "currently or periodically contain[] the resources and conditions necessary to support one or more life processes of a species," but which could do so after reasonable restoration efforts.  Nor is the Services' new definition consistent with or required by the *Weyerhaeuser* decision, in which the Court neither opined on the Services' longstanding, species-specific approach to defining "habitat" based on an individual species' life history, nor made any attempt to define the term.

4.      The Habitat Exclusion Rule—promulgated by FWS to allegedly "provide greater transparency and certainty"—creates a new process that will result in FWS's exclusion of more areas from critical habitat designations and the associated protections under the ESA.  85 Fed.

1    Reg. at 82,376.  Finalized without any changes from the proposed rule, which was released just

2    three months earlier, the Habitat Exclusion Rule, among other infirmities, unlawfully and

3    arbitrarily: biases the statutorily required economic analysis against designating critical habitat

4    and instead favors excluding both federal and non-federal lands from such designations; mandates

5    an exclusion analysis any time the proponent of exclusion puts forth "credible information"

6    supporting exclusion; and generally requires FWS to defer to outside sources regarding

7    information on impacts allegedly not within FWS's expertise (including some impacts that are, in

8    fact, within FWS's expertise).  *Id*. at 82,388–89.  Moreover, FWS's claim that the Habitat

9    Exclusion Rule is responsive to the Supreme Court's *Weyerhaeuser* decision ignores that the

10   Court did not, and, indeed, could not, authorize FWS to abdicate (and delegate to third parties) its

11   statutory duty to consider whether and how to conduct a critical habitat exclusion analysis under

12   section 4(b)(2) of the Act.  Furthermore, in violation of the APA, FWS altogether fails to explain

13   the Habitat Exclusion Rule's dramatic departure from its 2016 policy governing critical habitat

14   designations.  81 Fed. Reg. 7,226 (Feb. 11, 2016).

15        5.    The Services also violated NEPA by failing to assess the broader environmental

16   impacts of the Final Rules and by failing to circulate such analyses for public review and

17   comment.  Both Final Rules are unquestionably major federal actions that will significantly affect

18   the human environment by limiting designation of, and, accordingly, important protections for,

19   critical habitat.  Neither of these major, substantive Final Rules qualifies for the limited,

20   procedural categorical exclusions from NEPA compliance upon which the Services rely.  85 Fed.

21   Reg. at 81,421, 82,388 (claiming Habitat Definition Rule and Habitat Exclusion Rule fall within

22   categorical exclusion under 43 C.F.R. § 46.210(j) for "Policies, directives, regulations, and

23   guidelines: that are of an administrative, financial, legal, technical, or procedural nature").

24   Additionally, the Services unlawfully segmented their NEPA review of the Final Rules by

25   claiming piecemeal coverage under that categorical exclusion, rather than evaluating the Final

26   Rules' environmental impacts together, as NEPA requires.

27        6.    State Plaintiffs have a concrete interest in the Services' lawful implementation of the

28   ESA and its role in preventing harm to and promoting the recovery of imperiled wildlife.  These

4

1    resources are owned and held in trust by many of the State Plaintiffs for the benefit of their

2    citizens.  Imperiled plants and animals protected by the ESA are found in all of the Plaintiff

3    States, along with extensive critical habitat.  State Plaintiffs will be harmed by the Final Rules'

4    undermining and weakening of the ESA's key critical habitat designation requirements and

5    associated protections by, among other things, limiting qualifying habitat, facilitating exclusion

6    analyses, expanding impacts that may warrant exclusion, and thereby reducing critical habitat

7    designations.

8         7.    Accordingly, State Plaintiffs seek a declaration that the Services' issuance of the

9    Final Rules violates the ESA, APA, and NEPA, and request that the Court vacate and set aside

10   the Final Rules.

11                          **JURISDICTION AND VENUE**

12        8.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the

13   laws of the United States), 28 U.S.C. § 1346 (civil action against the United States), and 5 U.S.C.

14   §§ 701–06 (APA).  An actual controversy exists between the parties within the meaning of 28

15   U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief

16   pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

17        9.    The Final Rules constitute final agency actions under the APA.  5 U.S.C. §§ 702, 704,

18   706.  State Plaintiffs submitted timely and detailed comments opposing the Final Rules and have

19   therefore exhausted all administrative remedies with regard to this action.  State Plaintiffs have

20   suffered legal wrong due to the Services' actions and are adversely affected or aggrieved by the

21   Services' actions within the meaning of the United States Constitution and the APA.  *Id.* § 702.

22        10.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because this is

23   the judicial district in which Plaintiff State of California resides, and this action seeks relief

24   against federal agencies and officials acting in their official capacities.

25                          **INTRADISTRICT ASSIGNMENT**

26        11.   Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of

27   this action to any particular location or division of this Court.  However, this case is related to

28   *California, et al. v. Bernhardt, et al.*, Case No. 4:19-cv-06013 (complaint filed Sept. 25, 2019),

Complaint for Declaratory and Injunctive Relief

1   which challenges three other final rules promulgated by the Services in 2019 implementing the

2   ESA, which similarly undermine the ESA's core requirements, including its provisions for

3   designating and protecting critical habitat.  That case, along with two related challenges to the

4   same three final rules, have been assigned to the Oakland Division.  Pursuant to Civil Local Rule

5   3-12(b), State Plaintiffs intend to promptly file an Administrative Motion to Consider Whether

6   Cases Should Be Related in the earlier-filed action.

7                                                    **PARTIES**

8         12.    Plaintiff STATE OF CALIFORNIA brings this action by and through Attorney

9   General Xavier Becerra.  The Attorney General is the chief law enforcement officer of the State

10  and has the authority to file civil actions in order to protect public rights and interests, including

11  actions to protect the natural resources of the State.  Cal. Const. art. V, § 13; Cal. Gov't Code §§

12  12511, 12600-12612.  This challenge is brought in part pursuant to the Attorney General's

13  independent constitutional, statutory, and common law authority to represent the people's

14  interests in protecting the environment and natural resources of the State of California from

15  pollution, impairment, or destruction.  *Id.*; *D'Amico v. Bd. of Med. Exam'rs*, 11 Cal. 3d 1 (1974).

16        13.    The State of California has a sovereign interest in its natural resources and is the

17  sovereign and proprietary owner of all the State's fish and wildlife and water resources, which are

18  State property held in trust by the State for the benefit of the people of the State.  *People v.*

19  *Truckee Lumber Co.*, 116 Cal. 397 (1897); *Betchart v. Cal. Dep't of Fish & Game*, 158 Cal. App.

20  3d 1104 (1984); *Nat'l Audubon Soc'y v. Superior Ct.*, 33 Cal. 3d 419 (1983); Cal. Water Code §

21  102; Cal. Fish & Game Code §§ 711.7(a), 1802.  In addition, the State of California has enacted

22  numerous laws concerning the conservation, protection, restoration, and enhancement of the fish

23  and wildlife resources of the State, including endangered and threatened species, and their habitat.

24  Such laws include, but are not limited to, the California Endangered Species Act, which declares

25  that the conservation, protection, and enhancement of endangered and threatened species and

26  their habitat is a matter of statewide concern, and that it is the policy of the state to conserve,

27  protect, restore, and enhance endangered and threatened species and their habitat.  Cal. Fish &

28  Game Code §§ 2050, 2051(c), 2052.  As such, the State of California has a sovereign and

statutorily mandated interest in protecting listed species and critical habitat both within and outside of the State from harm.

14.     There are currently over 300 species listed as endangered or threatened under the ESA that reside wholly or partially within the State of California and its waters—more than any other mainland state.  Examples include the southern sea otter (*Enhydra lutris nereis*) found along California's central coastline, the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert, the marbled murrelet (*Brachyramphus marmoratus*) in north coast redwood forests, as well as two different runs of Chinook salmon (*Oncorhynchus tshawytscha*) and their spawning, rearing, and migration habitat in the Bay-Delta and Central Valley rivers and streams. California has millions of acres of lands, as well as thousands of miles of river, lake, estuary, and marine areas that are designated as critical habitat for these species.  Moreover, California contains tens of millions of acres of federal public lands, multiple federal water projects, numerous military bases and facilities and other federal facilities and infrastructure projects that are subject to the ESA's section 7 consultation requirements.  Further, countless acres of non-federal lands and numerous non-federal facilities and activities in California are subject to federal permitting and licensing requirements—and therefore section 7 consultation requirements.

15.     Plaintiff COMMONWEALTH OF MASSACHUSETTS brings this action by and through Attorney General Maura Healey.  The Attorney General is the chief legal officer of the Commonwealth and brings this action on behalf of itself and its residents to protect the Commonwealth's sovereign and proprietary interest in the conservation and protection of its natural resources and the environment.  *See* Mass. Const. Am. Art. 97; Mass. Gen. Laws, ch. 12, §§ 3 & 11D.

16.     Twenty-seven federally listed endangered or threatened species are known to occur in Massachusetts, including, for example, the endangered red-bellied cooter (*Pseudemys rubriventris*), Atlantic Right Whale (*Eubalaena glacialis*), shortnose sturgeon (*Acipenser brevirostrum*), and leatherback sea turtle (*Dermochelys coriacea*) and the threatened Atlantic sturgeon (*Acipenser oxyrinchus oxyrinchus*), piping plover (*Charadrius melodus*), and northern long-eared bat (*Myotis septentrionalis*).  More than three hundred thousand acres and more than

Complaint for Declaratory and Injunctive Relief

1  forty-five miles of the Merrimack and Connecticut Rivers in Massachusetts are designated as
2  critical habitat for federally listed species.

3      17.    Massachusetts also has enacted, and devotes significant resources to implementing,
4  numerous laws concerning the conservation, protection, restoration, and enhancement of the
5  Commonwealth's plant, fish, and wildlife resources and their habitat.  For example, the
6  Massachusetts Endangered Species Act protects over four hundred imperiled species, including
7  those listed as endangered, threatened, and species of special concern, and their habitat.  *See*
8  Mass. Gen. Laws, ch. 131A.  As such, the Commonwealth has an interest in protecting species in
9  the Commonwealth from harm both within and outside of Massachusetts.

10     18.    Plaintiff STATE OF MARYLAND brings this action by and through its Attorney
11 General, Brian E. Frosh.  The Attorney General of Maryland is the State's chief legal officer with
12 general charge, supervision, and direction of the State's legal business.  Under the Constitution of
13 Maryland, and as directed by the Maryland General Assembly, the Attorney General has the
14 authority to file suit to challenge action by the federal government that threatens the public
15 interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); Md. Code Ann., State
16 Gov't § 6-106.1.

17     19.    The State of Maryland has enacted laws to protect sensitive species and their habitat
18 and explicitly incorporates federally listed species into state regulations governing imperiled
19 species.  Nongame and Endangered Species Act, MD Code. Nat. Res. §§ 10-2A *et seq.*  Twenty-
20 one federally listed species, including thirteen animals and eight plants, are believed to occur in
21 Maryland.  A few examples include the federally endangered dwarf wedgemussel (*Alasmidonta*
22 *heterodon*), the federally threatened bog turtle (*Glyptemys muhlenbergii*), and the federally
23 threatened Puritan tiger beetle (*Cicindela puritan*).  Several of these species occur not just in
24 Maryland but in other states as well.  Maryland therefore has a distinct interest in the recovery of
25 these species not just within its own borders but throughout each species' range.

26     20.    Plaintiff STATE OF CONNECTICUT brings this action by and through Attorney
27 General William Tong.  The Attorney General of Connecticut is generally authorized to have
28 supervision over all legal matters in which the State of Connecticut is a party.  He is also

8

1   statutorily authorized to appear for the State "in all suits and other civil proceedings, except upon

2   criminal recognizances and bail bonds, in which the State is a party or is interested ... in any court

3   or other tribunal, as the duties of his office require; and all such suits shall be conducted by him

4   or under his direction."  Conn. Gen. Stat. § 3-125.

5        21.   Pursuant to the Connecticut Endangered Species Act, Conn. Gen. Stat. § 26-303 *et*

6   *seq.*, it is the position of the Connecticut General Assembly that those species of wildlife and

7   plants that are endangered or threatened are of "ecological, scientific, educational, historical,

8   economic, recreational and aesthetic value to the people of the [State of Connecticut], and that the

9   conservation, protection, and enhancement of such species and their habitats are of state-wide

10  concern."  *Id.* § 26-303.  As a consequence, "the General Assembly [of Connecticut] declares it is

11  a policy of the [S]tate to conserve, protect, restore, and enhance any endangered or threatened

12  species and essential habitat."  *Id.*

13       22.   At least fourteen federally-listed endangered or threatened species are known to occur

14  in Connecticut, including, but not limited to, the endangered Northern Long-Eared Bat (*Myotis*

15  *septentrionalis*), Indiana Bat (*Myotis sodalis*), Kemp's Ridley Sea Turtle (*Lepidochelys kempii*),

16  Atlantic Green Turtle (*Chelonia mydas*), Loggerhead Turtle (*Caretta caretta*), and Atlantic

17  Sturgeon (*Acipenser oxyrinchus*).  Connecticut also has enacted and devotes significant resources

18  to implementing a comprehensive environmental statutory scheme concerning the conservation,

19  protection, restoration and enhancement of the plant, fish, and wildlife resources and habitats

20  within the State, including the Connecticut Endangered Species Act, which protects hundreds of

21  imperiled species and their habitats, as well as the Connecticut Environmental Protection Act,

22  which protects the air, water, and natural resources of the State held within the public trust.  *See*

23  Conn. Gen. Stat. §§ 26-303 *et seq.*; 22a-14 *et seq.*  As such, the State of Connecticut has a

24  sovereign and statutorily mandated interest in protecting species in the State from harm both

25  within and outside of the State.

26       23.   Plaintiff STATE OF ILLINOIS brings this action by and through Attorney General

27  Kwame Raoul.  The Attorney General is the chief legal officer of the State of Illinois (Ill. Const.,

28  art V, § 15) and "has the prerogative of conducting legal affairs for the State."  *EPA v. Pollution*

9

*Control Bd.*, 372 N.E.2d 50, 51 (Ill. Sup. Ct. 1977).  He has common law authority to represent the People of the State of Illinois and "an obligation to represent the interests of the People so as to ensure a healthful environment for all the citizens of the State."  *People v. NL Indus.*, 604 N.E.2d 349, 358 (Ill. Sup. Ct. 1992).

24.     The State of Illinois has "ownership of and title to all wild birds and wild mammals" (520 ILCS 5/2.1 (2018)) and "all aquatic life" within the State (515 ILCS 5 (2018)).  *See United Taxidermists Ass'n v. Illinois Dep't of Natural Res.*, 436 Fed. Appx. 692, 695 (7th Cir. 2011).  Furthermore, the State of Illinois has enacted numerous laws to protect endangered species (e.g., 520 ILCS 10 (2018)), animal habitat (*e.g.*, 520 ILCS 20 (2018)), and the State's natural areas and caves (*e.g*., 525 ILCS 33 (2018), 525 ILCS 5/6 (2018)).  Accordingly, the State has a substantial interest in protecting wildlife both within and outside its borders.

25.     There are currently over 34 species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Illinois and its waters.  For example, the Illinois cave amphipod (*Gammarus acherondytes*) is a small crustacean that is endemic to six cave systems in Illinois' Monroe County and St. Clair County.  Illinois is also home to the piping plover (*Charadrius melodus*); two piping plover chicks recently hatched on the shores of Lake Michigan in Chicago's north side.  Additionally, Illinois has significant federally owned lands, including two areas managed by the U.S. Forest Service and numerous military bases, all subject to ESA's section 7 consultation requirements.

26.     Michigan Attorney General Dana Nessel brings this suit on behalf of Plaintiff the People of the STATE OF MICHIGAN.  The Michigan Attorney General is authorized to "appear for the people of [the] state in any ... court or tribunal, in any cause of matter ... in which the people of [the] state may be a party or interested."  Mich. Comp. Laws § 14.28.  The People declared when they enacted Michigan's Constitution that the "conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people."  Mich. Const. art. 4, § 52.  Accordingly, they tasked Michigan's Legislature with "the protection of ... [the] natural resources of the state from ... impairment and destruction."  *Id.*

10

27.     The Legislature responded by passing the Natural Resources and Environmental Protection Act.  Mich. Comp. Laws § 324.101 *et seq.*  That law declares that "[a]ll animals found in this state, whether resident or migratory and whether native or introduced, are the property of the people of the state."  *Id.* § 324.40105; *see also id.* § 324.48702(1) ("all fish, reptiles, amphibians, mollusks, and crustaceans found in this state are the property of the state.").  Part 365 of that law, titled Endangered Species Protection, requires Michigan to "perform those acts necessary for the conservation, protection, restoration, and propagation of endangered and threatened species of fish, wildlife, and plants in cooperation with the federal government, pursuant to the endangered species act of 1973, Public Law 93-205, 87 Stat. 884, and with rules promulgated by the secretary of the interior under that act."  *Id.* § 324.36502.

28.     Michigan has 26 plants and animals the Services have listed as threatened or endangered.  These include the Eastern massasauga rattlesnake in Michigan's marsh areas (*Sistrurus catenatus*), the piping plover on the shores of the Great Lakes (*Charadrius melodus*), and the iconic Michigan monkey-flower (*Mimulus michiganensis*).  Recovering these and other threatened or endangered species is key to protecting the People's interest in conserving and developing Michigan's natural resources.  Additionally, millions of acres in Michigan are owned by the federal government, making them subject to the ESA's section 7 consultation requirements.  These include forest areas such as the Hiawatha National Forest, and national parks such as Isle Royale National Park, Pictured Rocks National Lakeshore, and Sleeping Bear Dunes National Lakeshore.

29.     Plaintiff STATE OF MINNESOTA is a sovereign state in the United States of America.  Attorney General Keith Ellison brings this action on behalf of Minnesota to protect the interests of Minnesota and its residents.  The Attorney General's powers and duties include acting in federal court in matters of State concern.  Minn. Stat. § 8.01.

30.     Ownership of wild animals in Minnesota "is in the state, in its sovereign capacity for the benefit of all people of the state."  Minn. Stat. § 97A.025; *see also* Minn. Stat. § 97A.501, subd. 1.  In fulfillment of this wildlife trust obligation Minnesota has determined that its fish and wildlife are "to be conserved and enhanced through [the state's] planned scientific management,

11

protection, and utilization." Minn. Stat. § 84.941.  No person may take, import, transport, or sell

an endangered species of wild animal unless authorized by Minnesota's endangered species

statute.  Minn. Stat. § 97A.501, subd. 2.  Minnesota's Endangered Species Statute provides for

Minnesota to define and protect endangered, threatened, or species of special concern.  Minn.

Stat. § 84.0895.  Minnesota regulates the treatment of species that it has designated as endangered

and threatened.  Minn. R. 6212.1800-2300.  Minnesota's definitions of endangered and threatened

species differ from—but overlap with—federal definitions under the ESA, which also serves to

identify, regulate, and protect the wildlife in the state.  Minnesota's official List of Endangered,

Threatened, and Special Concern Species includes several animals as worthy of Minnesota's

"endangered" status, such as the Topeka Shiner (*nontropis topeka*), the Higgins Eye Pearlymussel

(*lampsilis higgininsi*), and the Winged Mapleleaf Mussel (*quadrula fragosa*), which are listed as

endangered under the federal definition.  It also includes certain species designated for

Minnesota's "special concern" status, such as the Canada lynx (*lynx canadensis*) and the Western

Prairie Fringed Orchid (*plantanthera praeclara*), which are listed federally as threatened.  Minn.

R. 6134.0200.  Certain species have federal designations but do not appear on Minnesota's list,

such as the rusty-patched bumble bee (*bombus affinis*), which is listed as endangered under the

federal definition.  In partnership with federal land management agencies and the FWS,

Minnesota has invested in, and implemented, programs to assist in protecting and recovering

these and other listed species and in protecting their critical habitat.  Minnesota therefore has an

interest in the recovery of these species in Minnesota.  In addition, many of the species defined

under Minnesota or federal regulations occur in other states and the management of those species

in other states affects their ongoing viability in Minnesota.  Minnesota therefore has an interest in

the recovery of such species throughout their range.

31.     Plaintiff STATE OF NEVADA brings this action by and through Attorney General

Aaron Ford.  The Nevada Attorney General is the chief law enforcement officer of the State and

has the authority to file civil actions in order to protect public rights and interests, including

actions to protect the natural resources of the State.  Nev. Const. art. V, § 19; N.R.S. 228.180.

This challenge is brought in part pursuant to the Attorney General's independent constitutional,

statutory, and common law authority to represent the people's interests in protecting the environment and natural resources of the State of Nevada from pollution, impairment, or destruction.  Nev. Const. art. V, § 19; N.R.S. 228.180.  In addition, the Nevada Department of Wildlife, established as a state agency by the Nevada Legislature pursuant to N.R.S. § 501.331, has requested that the Attorney General bring this suit to protect Nevada's sovereign interest in preserving threatened and endangered species.

32.    The State of Nevada has a sovereign interest in its natural resources and is the sovereign and proprietary owner of all the State's fish and wildlife and water resources, which are State property held in trust by the State for the benefit of the people of the State.  N.R.S. 501.100 provides that "[w]ildlife in this State not domesticated and in its natural habitat is part of the natural resources belonging to the people of the State of Nevada [and] [t]he preservation, protection, management and restoration of wildlife within the State contribute immeasurably to the aesthetic, recreational and economic aspects of these natural resources."  *See Ex parte Crosby*, 38 Nev. 389 (1915); *see also Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976) ("Unquestionably the States have broad trustee and police powers over wild animals within their jurisdictions.").  In addition, the State of Nevada has enacted numerous laws concerning the conservation, protection, restoration and enhancement of the fish and wildlife resources of the State, including endangered and threatened species, and their habitat.  As such, the State of Nevada has an interest in protecting species in the State from actions both within and outside of the State.

33.    Nevada has approximately 58,226,015.60 acres of federally-managed land, totaling 84.9 percent of the State's lands.  The federal agencies that manage Nevada's many acres are subject to the ESA's section 7 consultation requirements, including the Bureau of Indian Affairs, the Bureau of Land Management, the Bureau of Reclamation, the Department of Defense, the Department of Energy, FWS, the Forest Service, and the National Park Service.  Moreover, additional non-federal lands and facilities in Nevada are subject to federal permitting and licensing requirements.  There are currently over 38 species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Nevada.  Examples include the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert, the Devil's Hole

Complaint for Declaratory and Injunctive Relief

pupfish (*Cyprinodon diabolis*) reliant on limited aquifers within the Amargosa Desert ecosystem, the Lahontan cutthroat trout (*Oncorhynchus clarkii henshawi*) indigenous to Pyramid and Walker Lakes and nearly extirpated by American settlement in the Great Basin, Sierra Nevada bighorn sheep (*Ovis Canadensis sierrae*), and the greater sage-grouse (*Centrocercus urophasianus*) found in the foothills, plains and mountain slopes where sagebrush is present across fifteen of Nevada's seventeen counties.

34.     Plaintiff STATE OF NEW JERSEY is a sovereign state of the United States of America and brings this action on behalf of itself and as a trustee, guardian and representative of the residents and citizens of New Jersey.  New Jersey holds wildlife in trust for the benefit of all of its people.  The New Jersey Legislature has declared that it is the policy of the State to manage all forms of wildlife to insure their continued participation in the ecosystem.  N.J. Stat. Ann. § 23:2A-2.

35.     At least fourteen federally listed endangered or threatened species are known to occur in New Jersey, including, for example, the threatened piping plover (*Charadrius melodus*), red knot (*Calidris canutus rufa*), and Northern long-eared bat (*Myotis septentrionalis*), and the endangered Indiana bat (*Myotis sodalist*) and dwarf wedgemussel (*Alasmidonta heterodon*).  In 2018, New Jersey designated the threatened bog turtle (*Clemmys muhlenbergii*) as the official state reptile.  New Jersey protects, conserves, restores and enhances plants, fish and wildlife resources within the State through direct protective legislation such as the Endangered Non-Game Species Conservation Act (ENSCA), N.J. Stat. Ann. §§ 23:2A-1 to -16, and the Endangered Plant Species List Act, *id.* §§ 13:1B-15.151 to -158.  New Jersey also considers federal and state-listed species through other legislation including, but not limited to, the Freshwater Wetlands Protection Act, *id.* § 13:9B-7(a)(2), and the Highlands Water Protection and Planning Act, *id.* § 13:20-34(a)(4), and regulatory provisions such as the Pinelands Comprehensive Management Plan, N.J. Admin. Code §§ 7:50-6.27 and -6.33 (adopted, in part, pursuant to 16 U.S.C. § 471i(f)(1)(A)) and the Coastal Zone Management Rules, N.J. Admin. Code § 7:7-9.36.

36.     New Jersey also expends significant resources purchasing and maintaining key habitats relied upon by listed species, including vital foraging and nesting habitats along the

Complaint for Declaratory and Injunctive Relief

State's coastal Barrier Islands and the Cape May Peninsula.  For example, New Jersey invests time, resources and funding to manage the federally-listed threatened red knot.  Twice annually, red knots migrate between South America and the Arctic.  New Jersey and Delaware are critically important stops during the red knot's northern migration to feed on horseshoe crab eggs where the red knots must eat enough to continue their arduous journey to the Arctic.  New Jersey has an interest in protecting species inhabiting this State from harm both inside and outside of its borders, and New Jersey depends on its federal partners and other states to equally protect the red knot when it is not in New Jersey.

37.     Plaintiff STATE OF NEW MEXICO brings this action by and through Attorney General Hector Balderas.  The Attorney General of New Mexico is authorized to prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his judgment, the interest of the State requires such action.  NMSA 1978, § 8-5-2.  Under the Constitution of New Mexico, "protection of the state's beautiful and healthful environment is ... declared to be of fundamental importance to the public interest, health, safety and the general welfare."  N.M. Const. art. XX, § 21.  This provision "recognizes that a public trust duty exists for the protection of New Mexico's natural resources ... for the benefit of the people of this state."  *Sanders-Reed ex rel. Sanders-Reed v. Martinez*, 350 P.3d 1221, 1225 (N.M. Ct. App. 2015).  The New Mexico Game and Fish Department is entrusted with the maintenance of wildlife and wildlife habitat and related consultations with federal and other agencies toward that goal, NMSA 1978, § 17-1-5.1, and oversees a program for conserving endangered plant species, *id.* § 75-6-1; *see also id*. 19.33.2-19.33.6 (rules pertaining to state endangered and threatened species).

38.     FWS lists 40 animal and 13 plant species as threatened or endangered in New Mexico.  These include the endangered, iconic Southwestern willow flycatcher (*Empidonax traillii extimus*), the endangered Rio Grande silvery minnow (*Hybognathus amarus*), the endangered jaguar (*Panthera onca*), the endangered Mexican wolf (*Canis lupus baileyi*), and the threatened Mexican spotted owl (*Strix occidentalis lucida*).

39.     Protecting rare species and their habitats is fundamental to protecting New Mexico's wildlife and wild places.  Tourism, often focused on outdoor recreational activities, is an

15

important driver of New Mexico's economy.  In 2015, tourism accounted for $6.1 billion in direct spending and created roughly 89,000 jobs.  Among the most-visited places in the State is the Bosque del Apache National Wildlife Refuge, established in 1939 to provide a critical stopover for migrating waterfowl and recognized as one of the premier bird-watching areas in North America.  New Mexico hosts eight additional national wildlife refuges, fifteen national parks, and numerous national monuments, national conservation areas, and Department of Defense lands. New Mexico's five national forests—the Carson, Cibola, Gila, Lincoln, and Santa Fe national forests—encompass 9.4 million acres, including most of the State's mountainous areas, plus isolated sections of the State's eastern prairies.  Overall, 27,001,583 acres in New Mexico are federally owned, accounting for nearly 35 percent of the State's land mass.

40.     Plaintiff STATE OF NEW YORK brings this action by and through Attorney General Letitia James.  The Attorney General is the chief legal officer of the State of New York and brings this action on behalf of the State and its citizens and residents to protect their interests, and in furtherance of the State's sovereign and proprietary interests in the conservation and protection of the State's natural resources and the environment.  The State of New York has an ownership interest in all non-privately held fish and wildlife in the State and has exercised its police powers to enact laws for the protection of endangered and threatened species, protections long recognized to be vitally important and in the public interest.  *See* N.Y. Envtl. Conserv. Law §§ 11-0105, 11-0535; *Barrett v. State*, 220 N.Y. 423 (1917).  Wildlife conservation is a declared policy of the State of New York.  *See* N.Y. Const. art. XIV, § 3.

41.     There are dozens of federally endangered or threatened species that reside in whole or in part within the State of New York and its waters.  Many of these species are highly migratory, and their recovery requires conservation efforts in New York, up and down the Atlantic Seaboard, and beyond.  Examples include four species of sea turtles that can be found in New York waters—the loggerhead (*Caretta caretta*), green (*Chelonia mydas*), leatherback (*Dermochelys coriacea*) and Kemp's Ridley (*Lepidochelys kempii*).  Achieving effective recovery for each of these species requires strong ESA enforcement to protect such individuals that feed around Long Island, as well as those breeding and nesting in the southern United States.

42.     Robust species protections under the ESA are very important to New York.  New York hosts ten National Wildlife Refuges, home to federally protected species like the piping plover (*Charadrius melodus*), and dozens of other federal sites, which along with numerous in-State activities that require federal licensing and/or permitting and are subject to ESA section 7 consultation requirements.  Full and adequate implementation of the ESA's species-listing and habitat-designation provisions is critical for species' survival within New York and elsewhere.  To date, faithful implementation of the ESA by the federal government, coordinated together with state efforts, have helped species recover from the brink of extinction.  Habitat protection efforts led by NMFS and New York have greatly increased populations of the endangered shortnose sturgeon (*Acipenser brevirostrum*) and Atlantic sturgeon (*Acipenser oxyrinchus*).  The Northern long-eared bat (*Myotis septentrionalis*) also resides in-state and benefits from federal-state coordination.  And one of the greatest endangered species success stories, the recovery and delisting of the iconic Bald Eagle (*Haliaeetus leucocephalus*), is due to federal and state efforts including FWS critical habitat protections under the ESA, and New York's reintroduction of this virtually extirpated species by importing young birds and hand-rearing them before release.  Thus, strong ESA protections both within its State borders and throughout each species' range are fundamental to New York's interests.

43.     Plaintiff STATE OF NORTH CAROLINA brings this action by and through Attorney General Joshua H. Stein.  The North Carolina Attorney General is the chief legal officer of the State of North Carolina.  The Attorney General is empowered to appear for the State of North Carolina "in any cause or matter ... in which the State may be a party or interested."  N.C. Gen. Stat. § 114-2(1).  Moreover, the Attorney General is authorized to bring actions on behalf of the citizens of the State in "all matters affecting the public interest."  *Id.* § 114-2(8)(a).

44.     The State of North Carolina has a sovereign interest in its public trust resources.  Under North Carolina law, "the wildlife resources of North Carolina belong to the people of the State as a whole."  N.C. Gen. Stat. § 113-131(a).  The State of North Carolina has enacted laws and regulations concerning the conservation of the State's fish and wildlife resources, including endangered and threatened species.  *See, e.g., id.* §§ 113-331 to -337.

Complaint for Declaratory and Injunctive Relief

45.     FWS lists 39 animal and 27 plant species as endangered or threatened in North Carolina, including the endangered Red-cockaded woodpecker (*Picoides borealis*), Carolina northern flying squirrel (*Glaucmys sabrinus coloratus*), and Leatherback sea turtle (*Dermochelys coriacea*).  North Carolina contains over 2 million acres of federally-owned lands, including lands managed by the U.S. Forest Service, FWS, National Park Service, and Department of Defense, all of which are subject to the ESA's section 7 consultation requirements.

46.     Plaintiff STATE OF OREGON brings this suit by and through Attorney General Ellen Rosenblum.  The Oregon Attorney General is the chief legal officer of the State of Oregon. The Attorney General's duties include acting in federal court on matters of public concern and upon request by any State officer when, in the discretion of the Attorney General, the action may be necessary or advisable to protect the interests of the State.  Ore. Rev. Stat. § 180.060(1).  The Oregon Department of Fish and Wildlife, established as a State agency by the Oregon Legislature pursuant to Ore. Rev. Stat. § 496.080, has requested that the Attorney General bring this suit to protect Oregon's sovereign interest in preserving threatened and endangered species.

47.     The State of Oregon has a sovereign interest in its natural resources and is the sovereign owner of the State's fish and wildlife.  Under Oregon law, "[w]ildlife is the property of the State."  Ore. Rev. Stat. § 498.002.  The State of Oregon has enacted numerous laws and rules concerning the conservation and protection of the fish and wildlife resources of the State, including endangered and threatened species and their habitat.  *See, e.g.*, Oregon Endangered Species Act, Ore. Rev. Stat. §§ 496.171–496.192, 498.026; Fish and Wildlife Habitat Mitigation Policy, Or. Admin. R. 635-415-0000 (creating goals and standards to "mitigate impacts to fish and wildlife habitat caused by land and water development actions"); Goal 5 of Oregon's statewide land use planning goals, Or. Admin. R. 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(5) ("[l]ocal governments shall adopt programs that will protect natural resources," including wildlife habitat).  The State of Oregon has an interest in protecting species in the State from harm both within and outside of the State.

48.     Oregon is home to numerous fish, land animals, and plants that the Services have listed as endangered or threatened species.  There are listed species—such as the northern spotted

Complaint for Declaratory and Injunctive Relief

owl (*Strix occidentalis caurina*), marbled murrelet (*Brachyramphus marmoratus*), snowy plover (*Charadrius nivosus*), and bull trout (*Salvelinus confluentus*) —that depend on the tens of millions of acres of federal public lands and waters, including 12 national forests, 18 national wildlife refuges, Crater Lake National Park, and over 15 million acres of Bureau of Land Management lands.  The northern spotted owl is an example of a species for which critical habitat designations are important.  The owl relies on forests with closed canopies of old-growth trees that require 150 to 200 years to reach maturity.  Designation of critical habitat for the northern spotted owl and development of the Northwest Forest Plan required significant forest conservation measures, including careful planning of timber sales.  The Oregon Department of Fish and Wildlife ("ODFW") is concerned by a recent proposal (predating the adoption of the Habitat Exclusion Rule) to reduce northern spotted owl critical habitat by 204,653 acres, to accommodate planned timber harvest on Bureau of Land Management "O&C" lands, believing this exclusion could have a negative impact on the owl's prospects for survival and recovery.  Because of the length of time needed to return the land to old growth forest conditions, this reduction presents a high risk that these acres, once harvested, will never return to a condition suitable to support northern spotted owls.  The Habitat Exclusion Rule could lead to an increasing number of critical habitat exclusions that could be similarly damaging to listed species.

49.    Plaintiff the COMMONWEALTH OF PENNSYLVANIA is a sovereign state of the United States of America.  This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth."  Pa. Const. art. IV, § 4.1.  Attorney General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority.  71 Pa. Stat. § 732-204.

50.    The Commonwealth of Pennsylvania has a sovereign interest in its public natural resources, which "are the common property of all the people, including generations yet to come."  Pa. Const. art. I, § 27.  The Commonwealth, as trustee, must "conserve and maintain them for the benefit of all the people."  *Id.*; *Robinson Twp., Washington Cty. v. Pennsylvania*, 83 A.3d 901, 955-56 (Pa. 2013); *see also* 34 Pa. Stat. and Cons. Stat. § 103 (game and wildlife); 34 Pa. Stat. and Cons. Stat. Ann. § 2161 (game and wildlife); 30 Pa. Stat. and Cons. Stat. § 2506 (fish); 32 Pa.

Stat. and Cons. Stat. § 5302 (plants).  The Pennsylvania Constitution further protects every Pennsylvania resident's "right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment."  Pa. Const. art. I, § 27.  As such, the Commonwealth of Pennsylvania has an interest in protecting species in the Commonwealth from harm both within and outside of the Commonwealth.

51.    At least 19 federally listed and protected endangered or threatened species are known to occur in Pennsylvania, including the endangered rusty patched bumble bee (*Bombus affinis*) and piping plover (*Charadrius melodus*) and the threatened northern long-eared bat (*Myotis septentrionalis*).  Pennsylvania has enacted laws and regulations to protect endangered and threatened species and their habitat in the Commonwealth.  *See, e.g.*, 34 Pa. Stat. and Cons. Stat. § 2167 (wild birds and animals); 30 Pa. Stat. and Cons. Stat. § 2305 (fish, reptiles, amphibians, mussels); 32 Pa. Stat. and Cons. Stat. § 5311 (plants).  Pennsylvania law explicitly extends state protection to all federally listed wild birds, animals, fish, reptiles, amphibians, and mussels.  30 Pa. Stat. and Cons. Stat. § 102 (defining endangered and threatened fish, reptiles, amphibians, mussels); 34 Pa. Stat. and Cons. Stat. § 102 (defining endangered and threatened wild birds and animals).  Pennsylvania further empowers Commonwealth agencies to list and protect additional imperiled species.  30 Pa. Stat. and Cons. Stat. § 102 (fish, reptiles, amphibians, mussels); 34 Pa. Stat. and Cons. Stat. § 102 (wild birds and animals); 17 Pa. Code ch. 45 (plants).  As a result, Pennsylvania protects hundreds of endangered or threatened species.

52.    Plaintiff STATE OF RHODE ISLAND brings this action by and through Attorney General Peter F. Neronha.  The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State.  R.I. Const. art. I, § 17; R.I. Gen. Laws R.I. § 10-20-1, *et seq.*  This challenge is brought in part pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the people's interests in protecting the environment and natural resources of the State of Rhode Island from pollution, impairment, or destruction.  *Id.; Newport Realty, Inc. v. Lynch*, 878 A.2d 1021 (R.I. 2005).

53.     The State of Rhode Island has a sovereign interest in its natural resources and is the sovereign and proprietary owner of all the State's fish and wildlife and water resources, which are State property held in trust by the State for the benefit of the people of the State.  R.I. Const. Art. I § 17.  In addition, the State of Rhode Island has enacted numerous laws concerning the conservation, protection, restoration and enhancement of the fish and wildlife resources of the State, including endangered and threatened species, and their habitat.  As such, the State of Rhode Island has an interest in protecting species in the State from actions both within and outside of the State.

54.     There are currently thirteen species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Rhode Island and its waters.  Examples include the New England cottontail (*Sylvilagus transitionalis*), which, as recently as 1960, could be found throughout much of New England, but whose range has shrunk by 86 percent; the roseate tern (*Sterna dougallii*) and piping plover (*Charadrius melodus*), found along Rhode Island's coastal beaches and islands; the sandplain gerardia (*Agalinis acuta*), which inhabits dry, sandy, poor-nutrient soils in sandplain and serpentine sites; and the American burying beetle (*Nicrophorus americanus*), which once lived in 35 states, the District of Columbia, and three Canadian provinces, but now are known to occur in only four states.  Rhode Island has 5,157 acres of federal public lands, numerous federal wildlife refuges, multiple federal water projects, numerous military facilities and other federal facilities and infrastructure projects that are subject to the ESA's section 7 consultation requirements.  Moreover, countless acres of non-federal lands and numerous non-federal facilities and activities in Rhode Island are subject to federal permitting and licensing requirements—and therefore section 7 consultation requirements.

55.     Plaintiff STATE OF VERMONT brings this action by and through Attorney General Thomas J. Donovan, Jr.  The Attorney General is the chief legal officer of the State of Vermont. *See* Vt. Stat. Ann. tit. 3, § 152 ("The Attorney General may represent the State in all civil and criminal matters as at common law and as allowed by statute.").  Vermont is a sovereign entity and brings this action to protect its own sovereign and proprietary rights.  The Attorney General's powers and duties include acting in federal court on matters of public concern.  This challenge is

21

1  brought pursuant to the Attorney General's independent constitutional, statutory, and common

2  law authority to bring suit and obtain relief on behalf of the State of Vermont.

3      56.   "[T]he fish and wildlife of Vermont are held in trust by the State for the benefit of the

4  citizens of Vermont and shall not be reduced to private ownership.  The State of Vermont, in its

5  sovereign capacity as a trustee for the citizens of the State, shall have ownership, jurisdiction, and

6  control of all the fish and wildlife of Vermont." Vt. Stat. Ann. tit. 10, § 4081(a)(1).  The State of

7  Vermont has enacted laws protecting endangered and threatened species and critical habitat, and

8  currently lists 52 animal species, 8 of which are listed under the ESA, and 163 plant species, 3 of

9  which are listed under the ESA.  *See id.*, §§ 5401 *et seq.*  The Vermont Department of Fish and

10  Wildlife implements the Vermont endangered species protections and has a strong interest in

11  species protections both within Vermont and outside the State.

12      57.   Vermont hosts nearly a half a million acres of federal lands, including the Green

13  Mountain National Forest, the Missisquoi National Wildlife Refuge, and the Silvio O. Conte

14  National Fish and Wildlife Refuge.  These lands are subject to the ESA's section 7 consultation

15  requirements as are other State lands subject to federal permits and federal funding.

16      58.   Plaintiff STATE OF WASHINGTON is a sovereign entity and brings this action to

17  protect its own sovereign and proprietary rights.  The Attorney General is the chief legal adviser

18  to the State of Washington.  The Attorney General's powers and duties include acting in federal

19  court on matters of public concern.  This challenge is brought pursuant to the Attorney General's

20  independent constitutional, statutory, and common law authority to bring suit and obtain relief on

21  behalf of the State of Washington.

22      59.   Wildlife, fish, and shellfish are the property of the State of Washington.  Rev. Code

23  Wash. (RCW) § 77.04.012.  The Washington Department of Fish and Wildlife actively carries

24  forth the legislative mandate to, inter alia, preserve, protect, perpetuate, and manage wildlife, fish,

25  and wildlife and fish habitat.  *Id.*; *id.* § 77.04.055; *see also id.* § 77.110.030 (declaring that

26  "conservation, enhancement, and proper utilization of the state's natural resources … are

27  responsibilities of the state of Washington").

28

Complaint for Declaratory and Injunctive Relief

60.     The Washington Fish and Wildlife Commission classifies forty-five species as Endangered, Threatened, or Sensitive under State law.  Wash. Admin. Code 220-610-010; 220-200-100.  More than half of these species are also federally listed as endangered or threatened under the ESA, including southern resident killer whales (*Orcinus orca*), pygmy rabbits (*Brachylagus idahoensis*), streaked horned larks (*Eremophila alpestris strigata*), and green sea turtles (*Chelonia mydas*).  In addition, the Washington Department of Fish and Wildlife designates 102 species as candidates for state listing as endangered, threatened, or sensitive, and more than twenty of the state candidate species, including chinook (*Oncorhynchus tshawytscha*), chum (*Oncorhynchus keta*), and sockeye (*Oncorhynchus nerka*) salmon and steelhead (*Oncorhynchus mykiss*), are listed as threatened or endangered under the ESA.  In total, thirty-seven federally listed species compromising 50 Evolutionarily Significant Units and Distinct Population Segments live in Washington. Washington also has several species, including wolverines (*gulo gulo*), Island Marble butterflies (*Euchloe ausonides*), and fishers (*Martes pennanti*) that are candidates for federal listing.

61.     Washington expends significant resources to monitor, protect, and recover state and federally listed species and their critical habitat.  For example, the Washington Department of Fish and Wildlife spends approximately $600,000 annually for management and recovery of the endangered Taylor's checkerspot butterfly (*Euphydryas editha taylori*), which is native to the Pacific Northwest and is restricted to just eleven known populations, with eight of those populations occurring in Washington State.

62.     Washington hosts tens of millions of acres of federal lands across ten national forests, three national parks, twenty-three national wildlife refuges, three national monuments, and numerous Department of Defense lands.  These lands are subject to the ESA's section 7 consultation requirements.

63.     Plaintiff STATE OF WISCONSIN is a sovereign state of the United States of America and brings this action by and through its Attorney General, Joshua L. Kaul, who is the chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests.  *See* Wis. Stat. § 165.25(1m).  The Attorney General's powers

23

and duties include appearing for and representing the State on the governor's request, "in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." *Id.*

64.    In filing this action, the Attorney General seeks to prevent injuries to the State and its residents relating to their substantial interests in protecting and preserving threatened and endangered animals and plants.  These injuries include harms to Wisconsin's sovereign, quasi-sovereign, and proprietary interests.

65.    Wisconsin holds legal title to all wild animals in the state "for the purposes of regulating their enjoyment, use, disposition, and conservation." Wis. Stat. § 29.011(1).  In 1972, Wisconsin became one of the first states to enact its own state-level endangered species law.  *See generally id.* § 29.604.  In doing so, the Wisconsin Legislature found that "the activities of both individual persons and governmental agencies are tending to destroy the few remaining whole plant−animal communities in this state," and that the preservation of those communities "is of highest importance." *Id.* § 29.604(1).  The Legislature recognized "that certain wild animals and wild plants are endangered or threatened," and that those species "are entitled to preservation and protection as a matter of general state concern." *Id.* § 29.604(1).  The State of Wisconsin therefore has substantial sovereign and statutory interests in protecting species in the State from harms within and from outside of the State.

66.    The federal ESA has been important for species recovery efforts in Wisconsin.  The FWS lists 24 species in Wisconsin as federally threatened or endangered.  The State, through its Department of Natural Resources, works on numerous projects to maintain and restore its federally endangered and threatened species.  For example, over the past 20 years the Wisconsin DNR has worked with governmental and non-governmental partners toward the recovery of endangered piping plovers (*Charadrius melodus*).  Specific efforts have included protecting nests and adding and managing plover habitat.  As a result, Wisconsin has contributed at least 153 chicks toward the Great Lakes federal recovery goal of 150 breeding pairs, with the current population more than halfway to the goal.  Piping plovers had their best nesting season in more than a century in 2019.  Another species found in Wisconsin, Kirtland's Warbler (*Setophaga*

*kirtlandii*), was removed from the federal list in 2020, but it remains on Wisconsin's state endangered species list because it has not met the criteria to be delisted at the state level.

67.     Thousands of projects are reviewed annually in Wisconsin for potential impacts to state and federally listed plants and animals.  Wisconsin therefore has a strong interest in the FWS administering, interpreting, and enforcing the federal ESA to best facilitate species recovery in Wisconsin.  Additionally, nearly 1.8 million acres of land in Wisconsin are federally owned and are thus subject to the ESA's section 7 consultation requirement.  These lands include the Chequamegon-Nicolet National Forest, the Apostle Islands National Lakeshore, the Upper Mississippi National Wildlife and Fish Refuge, and the Horicon National Wildlife Refuge.

68.     Plaintiff the CITY OF NEW YORK brings this action by and through the Corporation Counsel James E. Johnson.  The Corporation Counsel is the chief legal officer of the City of New York and brings this action on behalf of itself and its residents to protect New York City's sovereign and proprietary interest in the conservation and protection of its natural resources and the environment.  *See* New York City Charter Chap. 17, § 394.

69.     New York City has a longstanding commitment to protection of endangered species and their habitat.  New York City hosts, among other species, a population of Atlantic Coast piping plovers (*Charadrius melodus*), that nests on the beach of the Rockaways in Brooklyn and was designated a threatened species by FWS.  New York City has substantial interest in protecting wildlife both within and outside of its borders.

70.     Defendant DAVID BERNHARDT is the Secretary of the United States Department of the Interior and is sued in his official capacity.  Mr. Bernhardt is responsible for implementing and fulfilling the duties of the United States Department of the Interior, including the administration of the ESA regarding endangered and threatened terrestrial and freshwater plant and animal species and certain marine species, and thus bears responsibility, in whole or in part, for the acts complained of in this Complaint.

71.     Defendant WILBUR ROSS is the Secretary of the United States Department of Commerce and is sued in his official capacity.  Mr. Ross is responsible for implementing and fulfilling the duties of the United States Department of Commerce, including the administration

of the ESA regarding most endangered and threatened marine and anadromous fish species, and thus bears responsibility, in whole or in part, for the acts complained of in this Complaint.

72.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency within the United States Department of the Interior to which the Secretary of the Interior has delegated authority to administer the ESA with regard to endangered and threatened terrestrial and freshwater plant and animal species and certain marine species, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

73.     Defendant NATIONAL MARINE FISHERIES SERVICE is an agency within the United States Department of Commerce to which the Secretary of Commerce has delegated authority to administer the ESA with regard to most endangered and threatened marine and anadromous fish species, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

## STATUTORY BACKGROUND

### I.     ENDANGERED SPECIES ACT.

74.     Congress enacted the ESA nearly fifty years ago in a bipartisan effort "to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978); *see* 16 U.S.C. § 1531(a).  The ESA accordingly enshrines a national policy of "institutionalized caution," *Hill*, 437 U.S. at 194, in recognition of the "overriding need *to devote whatever effort and resources [are] necessary* to avoid further diminution of national and worldwide wildlife resources," *id.* at 177 (internal quotation omitted, emphasis in original). The ESA constitutes "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

75.     The ESA's fundamental purposes are to "provide a means whereby the ecosystems upon which endangered ... and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered  … and threatened species[.]"  16 U.S.C. § 1531(b).  Furthermore, the ESA declares "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered … and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." *Id.* § 1531(c)(1).  The ESA defines

"conserve" broadly as "to use and the use of all methods and procedures which are necessary to bring any endangered … or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary"—*i.e.*, to the point of full recovery.  *Id.* § 1532(3).

76.     Since the law's passage in 1973, ninety-nine percent of ESA-protected species have not gone extinct.  Multiple species at the brink of extinction upon the ESA's enactment have seen dramatic population increases, including the black footed ferret (*Mustela nigripes*), California condor (*Gymnogyps californianus*), whooping crane (*Grus americana*), and shortnose sturgeon (*Acipenser brevirostrum*).  The ESA has resulted in the successful recovery and delisting of several species, including our national bird, the bald eagle (*Haliaeetus leucocephalus*), the American peregrine falcon (*Falco peregrinus anatum*), the Delmarva Peninsula fox squirrel (*Sciurus niger cinereus*), and the American alligator (*Alligator mississippiensis*).

77.     The ESA achieves these statutory purposes through multiple vital programs.  As relevant here, section 4 of the ESA, 16 U.S.C. § 1533, prescribes the process for the Services to list a species as "endangered" or "threatened" within the meaning of the statute and also to designate "critical habitat" for each such species, *id.* § 1533(a)(1), (a)(3)(A)(i), (b)(6)(C).  The ESA provides that the Services "*shall* designate critical habitat … on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat."  *Id.* § 1533(b)(2) (emphasis added).  Section 4(b)(2) further provides that "[t]he Secretary *may* exclude any area from critical habitat *if* he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, *unless* he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned."  *Id.* (emphases added).

78.     The ESA defines critical habitat as: "(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the [ESA], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas

1   outside the geographical area occupied by the species at the time it is listed ... upon a

2   determination by the Secretary that such areas are essential for the conservation of the species."

3   *Id.* § 1532(5)(A).  Although the ESA does not define "habitat," the Services' long-held position

4   has been that habitat is best determined on a species-by-species basis in order to account for the

5   divergent types of life histories, behavior patterns, and survival strategies of myriad listed species.

6   *See* Brief for the Federal Respondents, 2018 WL 3238924, **25-29, *Weyerhaeuser Co. v U.S. Fish &*

7   *Wildlife Serv.*, 139 S. Ct. 361 (2018).

8       79.     Section 7 of the ESA, 16 U.S.C. § 1536, requires all federal agencies, including the

9   Services, to "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out

10  programs for the conservation of" endangered and threatened species, *id.* § 1536(a)(1), and to

11  "insure" that any action they propose to authorize, fund, or carry out "is not likely to jeopardize

12  the continued existence" of any endangered or threatened species or, as particularly relevant here,

13  "result in the destruction or adverse modification of" any designated critical habitat, *id.*

14  § 1536(a)(2).  If a federal agency action "may affect" any listed species or critical habitat, the

15  federal action agency must initiate consultation with the relevant Service.  50 C.F.R. § 402.14(a);

16  *see* 16 U.S.C. §§ 1536(a)–(b), (c)(1); 50 C.F.R. §§ 402.12, 402.14(b)(1).

17      80.     If the federal action agency or the appropriate Service determines that the action

18  "may affect" a listed species or designated critical habitat, the Service must prepare a biological

19  opinion on the effects of the action on the species and/or critical habitat.  50 C.F.R. § 402.14(a);

20  *see* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(b)(1).  Where the Services find the action is

21  likely to jeopardize the continued existence of any listed species or adversely modify or destroy

22  any designated critical habitat, the biological opinion also must include alternatives to the agency

23  action, identify the impacts of any incidental take on the species, and include mitigation measures

24  for any authorized take.  *Id.* § 1536(b)(4).

25  **II.    ADMINISTRATIVE PROCEDURE ACT.**

26      81.     The APA governs the procedural requirements for federal agency decision-making,

27  including the agency rulemaking process.  Under the APA, a "reviewing court shall … hold

28  unlawful and set aside" federal agency action found to be "arbitrary, capricious, an abuse of

Complaint for Declaratory and Injunctive Relief

discretion, or otherwise not in accordance with law," "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).  An agency action is arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency does not have authority to adopt a regulation that is "manifestly contrary to the statute."  *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *see also* 5 U.S.C. § 706(2)(C).

82.     Additionally, "[a]gencies are free to change their existing policies," but they must "provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citing *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005)).  While an agency need not show that a new rule is "better" than the rule it replaced, it still must demonstrate that "it is permissible under the statute, that there are good reasons for it, and that the agency *believes it* to be better, which the conscious change of course adequately indicates."  *Federal Commc'ns. Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).  Further, an agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy," "or when its prior policy has engendered serious reliance interests that must be taken into account."  *Id.* Any "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."  *National Cable & Telecomms. Ass'n*, 545 U.S. at 981.

83.     Finally, prior to promulgating, amending, or repealing a rule, agencies must engage in a public notice-and-comment process.  5 U.S.C. §§ 551(5), 553.  Notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  *Id.* § 553(b).  To satisfy the requirements of APA, notice of a proposed rule must "provide an

accurate picture of the reasoning that has led the agency to the proposed rule," to allow an "opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules." *Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 528-30 (D.C. Cir. 1982). An agency must afford the public notice of specific regulatory changes and its reasoned basis for those changes to provide the public an opportunity for meaningful comment. *Home Box Office v. Federal Commc'ns Comm'n*, 567 F.2d 9, 35-36 (D.C. Cir. 1977). The public may then submit comments, which the agency must consider before promulgating a final rule. 5 U.S.C. § 553(c). This process is designed to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.*

84.    While an agency may modify a proposed rule in response to public comments, it may not finalize a rule that is not a "logical outgrowth" of the proposed rule. *Natural Res. Def. Council v. Environmental Prot. Agency*, 279 F.3d 1180, 1186 (9th Cir. 2002). If "a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule," the agency must afford a new opportunity for notice and comment on the rule. *Id.*

## III.    NATIONAL ENVIRONMENTAL POLICY ACT.

85.    NEPA, 42 U.S.C. §§ 4321 *et seq.*, is the "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1(a).[1] NEPA's fundamental purposes are to ensure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken," and that "public officials make decisions that are based on

---

[1] On July 16, 2020, the Council on Environmental Quality ("CEQ") finalized an update to its 1978 regulations implementing NEPA, which took effect on September 14, 2020. 85 Fed. Reg. 43,304 (July 16, 2020). According to this rule, for NEPA reviews that have already begun "before the final rule's effective date, agencies may choose whether to apply the revised regulations or proceed under the 1978 regulations and their existing agency NEPA procedures. Agencies should clearly indicate to interested and affected parties which procedures it is applying for each proposed action." *Id.* at 43,340. Here, the Services do not indicate which procedures they are applying, but cite only to regulatory language that follows the requirements of the 1978 regulations. *See* 85 Fed. Reg. at 81,421; 85 Fed. Reg. at 82,388. Consequently, the 1978 regulations apply and are cited here.

1   understanding of environmental consequences, and take actions that protect, restore, and enhance

2   the environment." *Id.* § 1500.1(b)-(c).

3        86.   To achieve these purposes, NEPA requires the preparation of a detailed

4   environmental impact statement ("EIS") for any "major federal action significantly affecting the

5   quality of the human environment." 42 U.S.C. § 4332(2)(C).  A "major federal action" includes

6   "new or revised agency rules [and] regulations." 40 C.F.R. § 1508.18(a).  To determine whether

7   a proposed action may significantly affect the environment, NEPA requires that both the context

8   and the intensity of an action be considered.  40 C.F.R. § 1508.27.  In evaluating the context,

9   "[s]ignificance varies with the setting of the proposed action" and includes an examination of "the

10   affected region, the affected interests, and the locality." *Id.* § 1508.27(a).  Intensity "refers to the

11   severity of impact," and NEPA's implementing regulations list ten factors to be considered in

12   evaluating intensity, including "[t]he degree to which the action may adversely affect an

13   endangered or threatened species or its [critical] habitat" under the ESA. *Id.* § 1508.27(b)(9).

14   The presence of just "one of these factors may be sufficient to require the preparation of an EIS in

15   appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865

16   (9th Cir. 2005).

17        87.   In "certain narrow instances," an agency does not have to prepare an EIS, or a

18   preliminary environmental assessment, if the action to be taken falls under a categorical

19   exclusion. *See Coalition of Concerned Citizens to Make Art Smart v. Federal Hwy. Transit*

20   *Admin.*, 843 F.3d 886, 902 (10th Cir. 2016) (citing 40 C.F.R. § 1508.4).  But agencies may

21   invoke a categorical exclusion only for "a category of actions which do not individually *or*

22   cumulatively have a significant effect on the human environment and which have been found to

23   have no such effect on procedures adopted by a Federal agency in implementation of [NEPA]

24   regulations." 40 C.F.R. § 1508.4; *see also id.* § 1507.3(b)(2)(ii).  The Services have established

25   limited categorical exclusions for certain actions, including regulations "that are of an

26   administrative, financial, legal, technical, or procedural nature; or whose environmental effects

27   are too broad, speculative, or conjectural to lend themselves to meaningful analysis." *See* 43

28   C.F.R. § 46.210(i); *see also* National Oceanic and Atmospheric Administration ("NOAA")

1   Administrative Order 216-6A.  Under NEPA's implementing regulations, however, an agency

2   "*shall provide for* extraordinary circumstances in which a normally excluded action may have a

3   significant environmental effect," in which case an EIS is still required.  40 C.F.R. § 1508.4

4   (emphasis added).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   SPECIES PROTECTION UNDER THE ESA.

7   88.   Currently, the ESA protects more than 1,600 plant and animal species in the United

8   States and its territories, and millions of acres of land have been designated as critical habitat to

9   foster species conservation and recovery.

10   89.   State Plaintiffs have seen significant benefits and steps taken toward recovery of at-

11   risk species through implementation of the ESA's core requirements.  Among many other

12   examples, populations of the Atlantic Coast piping plover (*Charadrius melodus*), which is listed

13   as a threatened species along most of the East Coast and thus is subject to FWS's longstanding

14   regulation prohibiting take of threatened species, have more than doubled in the last twenty years

15   due to FWS's conservation planning, federal enforcement, and cooperative efforts between

16   federal, state, and local partners.  Recovery efforts have been particularly successful in

17   Massachusetts, where the East Coast's largest breeding population of piping plover has

18   rebounded from fewer than 150 pairs in 1990, to more than 740 pairs in 2019, increasing more

19   than 500 percent since the species was listed in 1986.  Preliminary data indicate that the

20   population increased to approximately 800 pairs in 2020.  Despite these gains, however, piping

21   plovers' continued recovery is threatened by habitat loss, including from climate-change-induced

22   sea level rise.

23   90.   The California condor (*Gymnogyps californianus*), the largest land bird in North

24   America, has been listed as "endangered" since the ESA's inception and was on the brink of

25   extinction in 1982 with just twenty-three known individuals.  By 1987, all remaining wild

26   condors had been placed into a captive breeding program.  Recovery efforts led by FWS,

27   California state agencies, and other partners have increased the population to 463 birds as of 2017

28   and successfully reintroduced captive-bred condors to the wild.  These efforts are now in their

Complaint for Declaratory and Injunctive Relief

final phase, with a focus on creating self-sustaining populations and managing continued threats to the species, such as lead ammunition, trash, and habitat loss.

91.   The smallest rabbit in North America, the pygmy rabbit (*Brachylagus idahoensis*), was listed as an endangered species under Washington state law in 1993 and by 2001 was considered nearly extinct, with an estimated population of fewer than fifty individuals.  In 2003, FWS listed a distinct population segment of the species known as the Columbia Basin pygmy rabbit as endangered under the ESA.  Since that time, the species has begun to recover in Washington as a result of a cooperative effort by FWS, the Washington Department of Fish and Wildlife, researchers, and other state agencies.  Thousands of rabbits have been reintroduced on state and private land, with promising evidence of a growing population.  These steps toward recovery would not be possible without the mutually supporting protections of state and federal law.  Nevertheless, loss and degradation of the species' shrubsteppe habitat presents a conservation threat, and habitat conservation will be a critical aspect of species recovery. Moreover, the pygmy rabbit is rated a "moderate-high" vulnerability to climate change due to conditions that will lead to larger, more frequent, and hotter wildfires, thereby reducing the presence of sagebrush.

92.   The shortnose sturgeon (*Acipenser brevirostrum*) is an anadromous fish found in rivers, estuaries, and coastal waters along the Atlantic Coast of North America.  Overfishing, river damming, and water pollution greatly reduced its numbers, and the shortnose sturgeon was listed as endangered under the ESA's precursor in 1967.  However, fishing prohibitions and habitat protection efforts led by NMFS and New York have allowed the shortnose sturgeon population to increase in New York's Hudson River from about 12,669 in 1979 to more than 60,000 today.

## II.   THE ESA'S IMPLEMENTING REGULATIONS AND THE FINAL RULES.

93.   FWS and NMFS share joint responsibility for the protection and conservation of endangered and threatened species under the ESA.  In general, FWS is responsible for terrestrial and inland aquatic fish, wildlife, and plant species, while NMFS is responsible for marine and anadromous species.

Complaint for Declaratory and Injunctive Relief

94.     The Services adopted joint regulations implementing sections 4 and 7 of the ESA during the 1980s.  *See e.g.*, 45 Fed. Reg. 13,010 (Feb. 27, 1980) (section 4); 48 Fed. Reg. 38,900 (Oct. 1, 1984) (section 4); 51 Fed. Reg. 19,926 (June 3, 1986) (section 7).  Until recently, the Services had not substantially amended these longstanding regulations, although the Services adopted minor amendments to the processes for listing species, designating critical habitat, and conducting section 7 consultations in 2015 and 2016.  *See* 80 Fed. Reg. 26,832 (May 11, 2015); 81 Fed. Reg. 7,214 (Feb. 11, 2016); 81 Fed. Reg. 7,414 (Feb. 11, 2016).

95.     In August 2019, however, the Services published three "deregulatory" rules, under the guise of increasing clarity and efficiency, that significantly weaken several key requirements of the ESA's implementing regulations, including provisions for listing imperiled species and designating critical habitat.  84 Fed. Reg. 45,020 (Aug. 27, 2019); 84 Fed. Reg. 44,976 (Aug. 27, 2019); 84 Fed. Reg. 44,753 (Aug. 27, 2019).  State Plaintiffs (and others) are currently challenging those rules in this Court.  *California, et al. v. Bernhardt, et al.*, Case No. 4:19-cv-06013-JST.

96.     Then, on August 5, 2020, the Services jointly published a proposed rule to define the term "habitat" in their ESA implementing regulations, 85 Fed. Reg. 47,333 (Aug. 5, 2020) ("proposed Habitat Definition Rule").  The following month, on September 8, 2020, FWS published a proposed rule to establish a process for excluding critical habitat from designation, 85 Fed. Reg. 55,398 (Sept. 8, 2020) ("proposed Habitat Exclusion Rule") (together with the proposed Habitat Definition Rule, the "Proposed Rules").

97.     The proposed Habitat Definition Rule proposed adding the following definition of "habitat" to 50 C.F.R. § 424.02:

The physical places that individuals of a species depend upon to carry out one or more life processes.  Habitat includes areas with existing attributes that have the capacity to support individuals of the species.

98.     The proposed Habitat Definition Rule also sought comment on the following alternative definition of "habitat" to add to 50 C.F.R. § 424.02:

The physical places that individuals of a species use to carry out one or more life

34

processes. Habitat includes areas where individuals of the species do not presently

exist but have the capacity to support such individuals, only where the necessary

attributes to support the species presently exist.

99.     The proposed Habitat Exclusion Rule sought to establish a new process for excluding

areas from critical habitat designations made by FWS pursuant to section 4(b) of the ESA, 16

U.S.C. § 1533(b).  Among other unlawful changes, FWS proposed a new mandatory obligation

on FWS to undertake an "exclusion analysis" when a "proponent of excluding a particular area …

presented credible information regarding ... meaningful economic" or other impacts supporting

exclusion benefits, and proposed to enable FWS to defer to outside experts on a variety of

impacts. 85 Fed. Reg. at 55,406–07.  If FWS determined that the benefits of excluding a

particular area outweighed the benefits of including that area as critical habitat, the proposed rule

provided that the FWS "shall exclude" that area, unless exclusion would result in the extinction of

a species.  *Id*. at 55,407.  The proposed Habitat Exclusion Rule also proposed to reverse FWS's

2016 policy of prioritizing federal lands for critical habitat designation by requiring it to consider

information supporting the exclusion of federal lands based on "impacts" such as federal

agencies' ESA consulting costs and applicants' costs to modify a project to avoid habitat impacts.

*Id.* at 55,402.

100.  Although both Proposed Rules would significantly weaken protections for our

nation's most imperiled species, the Services again characterized the Proposed Rules as changes

to increase clarity in ESA implementation, provided only thirty-day periods for public comment,

and held no public hearings.

101.  On September 4, 2020, and October 8, 2020, many of the undersigned State Plaintiffs

submitted comments on the proposed Habitat Definition Rule and proposed Habitat Exclusion

Rule, respectively, urging the Services to withdraw the Proposed Rules on the grounds that they

would, if finalized, be unlawful, arbitrary, capricious, and contrary to the ESA, APA, NEPA, and

would harm State Plaintiffs' interests.

102.  Despite significant opposition, on December 16, 2020, the Services issued the Habitat

Definition Rule, and on December 18, 2020, FWS issued the Habitat Exclusion Rule.

103.  The Habitat Definition Rule adds to 50 C.F.R. § 424.02 the following definition of "habitat," which did not appear in, and is not a logical outgrowth of, the proposed Habitat Definition Rule:

> For the purposes of designating critical habitat only, habitat is the abiotic and biotic setting that currently or periodically contains the resources and conditions necessary to support one or more life processes of a species.

85 Fed. Reg. at 81,421.

104.  FWS published the final Habitat Exclusion Rule exactly as proposed, creating a new, unlawful and arbitrary process that FWS will follow to exclude areas from critical habitat designation and associated protections.  *See* 85 Fed. Reg. at 82,388–89.  For example, the Habitat Exclusion Rule unlawfully and arbitrarily:

a.  Mandates that the FWS conduct a critical habitat exclusion analysis in any case where a "proponent of excluding a particular area … has presented credible information regarding the existence of a meaningful economic or other relevant impact supporting a benefit of exclusion";

b.  Requires FWS to defer to outside "experts" in, or "sources with firsthand knowledge of," a new non-exhaustive list of impacts deemed "outside of the scope of [FWS]'s expertise"—including some biological impacts within FWS's expertise—when analyzing the benefits of including or excluding an area from designation as critical habitat unless FWS has "knowledge or material evidence that rebuts that information";

c.  Biases the required economic analysis against designating critical habitat for species conservation and instead favors excluding both federal and non-federal lands from such designations;

d.  Reverses FWS's prior policy—which prioritized designation of critical habitat on federal lands—by requiring FWS to consider information supporting the exclusion of federal lands based on broadly defined "impacts," such as ESA consulting costs borne by federal agencies and costs borne by applicants to modify a project to avoid habitat impacts;

36

e.   Allows FWS to exclude critical habitat on both federal and nonfederal land based on a wide range of economic impacts and "other relevant impacts," including undefined "community interests," such as disruption of planned community development projects; and

f.   Requires FWS to consider implementation of conservation plans, agreements, or partnerships authorized by incidental take permits under section 10 of the ESA when determining whether to exclude areas covered by such plans from critical habitat.

105.   Each of the Final Rules is a major federal action that will significantly affect the human environment under NEPA.  The Services, however, provided no environmental analysis of the Proposed Rules under that statute.  Instead, the Services erroneously found that the Final Rules are categorically excluded from NEPA review because they "are of an administrative, financial, legal, technical, or procedural nature."  85 Fed. Reg. at 81,421, 82,388.

**III.   FINAL RULES' INJURIES TO STATE PLAINTIFFS.**

106.   State Plaintiffs are uniquely harmed by the Final Rules' undermining and weakening of the ESA's key critical habitat designation requirements and associated protections by, among other things, limiting qualifying habitat, facilitating exclusion analyses, expanding impacts that may warrant exclusion, and thereby reducing critical habitat designations.

107.   First, State Plaintiffs have a concrete interest in preventing harm to their natural resources, including listed species and critical habitat, both in general and under the ESA in particular.  As the Supreme Court has recognized, State Plaintiffs are entitled to "special solicitude" in seeking to remedy environmental harms.  *See Massachusetts v. Environmental Prot. Agency*, 549 U.S. 497, 520 (2007).  These interests are particularly robust in the context of the ESA, which conserves the invaluable natural heritage within states' borders.  And that a state's own territory is the "territory alleged to be affected" by the challenged action "reinforces the conclusion that its stake in the outcome of this case is sufficiently concrete to warrant the exercise of federal judicial power."  *Id.* at 519 (internal quotation marks omitted).

108.   Indeed, in most of the Plaintiff States, the states own and hold fish and wildlife resources in both a proprietary and regulatory capacity in trust for the benefit of the entire people of the state.

109.   The ESA specifically directs the Services to "cooperate to the maximum extent practicable with the States" in implementing the ESA and also gives State Plaintiffs a distinct role in ensuring the faithful and fully informed implementation of the ESA's species conservation mandates.  16 U.S.C. § 1535(a).

110.   State Plaintiffs thus have an important interest in preventing and remedying harm to endangered and threatened species that reside in habitat both within and across the State Plaintiffs' borders.  The Final Rules' weakening of the ESA's substantive and procedural safeguards for species and critical habitat significantly and adversely affects the fish and wildlife resources of State Plaintiffs and curtails the ability of State Plaintiffs to help prevent federally listed species from sliding further toward extinction.  In addition, federally listed species living in the State Plaintiffs' sovereign lands are vulnerable to the escalating adverse effects of climate change, such as species in coastal states that are at increasing risk from the effects of rising sea levels.

111.   Second, and relatedly, the ESA expressly declares that endangered and threatened "species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people."  *Id.* § 1531(a)(3).  Reducing the State Plaintiffs' wealth of wild species would damage each of these values and "diminish[] a natural resource that could otherwise be used for present and future commercial purposes." *National Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041, 1053 (D.C. Cir. 1997); *see also San Luis & Delta–Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1176–77 (9th Cir. 2011).  And although the harms that would result from the loss of biological diversity are enormous, the nation cannot fully apprehend their scope because of the "*unknown* uses that endangered species might have and ... the *unforeseeable* place such creatures may have in the chain of life on this planet." *Hill*, 437 U.S. at 178-79 (emphases in original); *see also id.* at 178 (noting that "[t]he

Complaint for Declaratory and Injunctive Relief

1    value of this genetic heritage is, quite literally, incalculable") (internal quotation marks and

2    citations omitted).

3         112.   Third, with the Final Rules' unlawful and arbitrary weakening of federal protections,

4    the responsibility for, and burden of, protecting imperiled species and their habitats within state

5    borders would fall more heavily on State Plaintiffs.  *See Texas v. United States*, 809 F.3d 134,

6    155 (5th Cir. 2015) (impact on state resources provides basis for standing).  Filling that regulatory

7    gap would detract from State Plaintiffs' efforts and resources to carry out their own programs and

8    impose significantly increased costs and burdens on the State Plaintiffs.  For example, under the

9    new Habitat Definition Rule and Habitat Exclusion Rule, the ESA will no longer protect as

10   "critical habitat" areas that are essential to the conservation of species whose current habitat is

11   threatened by climate change or other environmental threats, but that do not yet contain the

12   features that will contribute to such conservation.  In such cases, State Plaintiffs will bear the

13   burden of identifying and protecting that habitat under state regulatory programs to ensure species

14   conservation and recovery.  *See, e.g.*, Mass. Gen. Laws. Ch. 131A, §§ 2, 4-5 (providing for

15   review and designation of "significant habitats" for state-listed rare species and barring alteration

16   of such habitat without permit); 321 Code Mass. Regs. §§ 10.00 *et seq.* (providing for delineation

17   of, and standards and procedures for conducting activities in, "priority habitat" for state-listed rare

18   species); *see Air Alliance Hous. v. U.S. Envtl. Prot. Agency*, 906 F.3d 1049, 1059-60 (D.C. Cir.

19   2018) ("Monetary expenditures to mitigate and recover from harms that could have been

20   prevented absent the [federal rule] are precisely the kind of 'pocketbook' injury that is incurred

21   by the state itself.").

22        113.   Moreover, while State Plaintiffs can act to protect imperiled species and habitat

23   within their own borders, they cannot do the same for such species outside of state borders and

24   they cannot secure federal consultation triggered by anticipated effects on federally designated

25   critical habitat.  Thus, despite the resource-intensive efforts described above, the State Plaintiffs

26   may not be able to wholly fill the regulatory gaps created by the Final Rules.

27        114.   Finally, the Services' failures to prepare an EIS or environmental assessment for the

28   Final Rules, and to provide sufficient opportunity for public notice and comment on the Habitat

Definition Rule, have harmed State Plaintiffs' procedural interests in participating in a legally sound environmental review and rulemaking process that adequately considers and accounts for public input, and adequately considers and mitigates the impacts of federal rulemaking on the State Plaintiffs' natural resources.

115.   Consequently, State Plaintiffs have suffered a legal wrong and concrete injury as a result of the Services' actions and have standing to bring this suit.  Declaring the Final Rules *ultra vires* and arbitrary and capricious, and vacating these actions, will redress the harms suffered by State Plaintiffs.

**FIRST CAUSE OF ACTION**
**(Violations of the ESA and APA,**
**16 U.S.C. §§ 1531, 1532, 1533, 1536; 5 U.S.C. § 706)**

116.   Paragraphs 1 through 115 are realleged and incorporated herein by reference.

117.   Under the APA, a "reviewing court shall … hold unlawful and set aside" agency action found to be "an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(A), (C).  An agency does not have authority to adopt a regulation that is "manifestly contrary to the statute."  *Chevron*, 467 U.S. at 844; *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 703 (1995).

118.   Here, the Final Rules violate the ESA's plain language, structure, and purpose, and exceed the scope of the Services' jurisdiction, authority, and discretion under the ESA.

119.   The Habitat Definition Rule's new definition of "habitat" to limit critical habitat designations to the area that "currently or periodically contains the resources and conditions necessary to support one or more life processes of a species" is contrary to 16 U.S.C. § 1532(5)(A) and 16 U.S.C. § 1533(b)(1)(A), and the ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) & (c), and 1536(a)(1).

120.   The Habitat Exclusion Rule violates the ESA in the following respects, among others:

a.   The new process for conducting economic impact analyses in 50 C.F.R. § 17.90(a), (c), and (e) is contrary to 16 U.S.C. §§ 1532(5)(A) and 1533(a)(3)(A) and (b)(2), and the

Complaint for Declaratory and Injunctive Relief

ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) and (c), and 1536(a)(1);

b. The new extensive list in 50 C.F.R. §§ 17.90(a) and (d)(1) of "economic impacts" and "other relevant impacts" to be considered in the exclusion analysis is contrary to 16 U.S.C. §§ 1532(5)(A) and 1533(a)(3)(A) and (b)(2), and the ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) and (c), and 1536(a)(1);

c. The requirements in 50 C.F.R. § 17.90(c)(2) and (e) that FWS "will" conduct an exclusion analysis when a "proponent of excluding a particular area … has presented credible information regarding the existence of a meaningful economic or other relevant impact supporting a benefit of exclusion for that particular area" and "shall exclude" an area from critical habitat designation if FWS "determines that the benefits of excluding a particular area from critical habitat outweigh the benefits of specifying that area as part of critical habitat" are contrary to 16 U.S.C. § 1533(a)(3)(A) and (b)(2) and the ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) and (c), and 1536(a)(1);

d. The requirement in 50 C.F.R. § 17.90(d)(1) that FWS defer to outside "experts in" or those with "firsthand knowledge of" areas that are "outside of the scope of the [FWS]'s expertise" unless FWS has "knowledge or material evidence" rebutting that information, and to only consider information from proponents of critical habitat exclusion, is contrary to 16 U.S.C. § 1533(a)(3)(A) and (b)(2) and the ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) and (c), and 1536(a)(1); and

e. The requirement in 50 C.F.R. § 17.90(d)(3) that FWS consider implementation of conservation plans, agreements, or partnerships authorized by an incidental take permit under section 10 of the ESA is contrary to 16 U.S.C. §§ 1533(a)(3)(A) and (b)(2) and 1536(a)(2) and (b)(4) and the ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) and (c), and 1536(a)(1).

121.   Accordingly, in promulgating the Final Rules, the Services acted in a manner that constituted an abuse of discretion, is not in accordance with law, and is in excess of the Services' statutory authority, in violation of the ESA and the APA.  16 U.S.C. §§ 1531, 1532, 1533, 1536; 5

U.S.C. § 706.  Consequently, the Habitat Definition Rule and Habitat Exclusion Rule should be held unlawful and set aside.

**SECOND CAUSE OF ACTION**
**(Violations of the APA,**
**5 U.S.C. §§ 553, 706)**

122.  Paragraphs 1 through 121 are realleged and incorporated herein by reference.

123.  In promulgating a regulation under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (internal quotation and citation omitted).  A regulation is arbitrary and capricious if the agency "relie[s] on factors which Congress has not intended it to consider," "entirely fail[s] to consider an important aspect of the problem," or has "offered an explanation for its decision that runs counter to the evidence before the agency" or "is so implausible that it could not be ascribed to a difference of view or the product of agency expertise."  *Id.*

124.  Additionally, "[a]gencies are free to change their existing policies," but they must "provide a reasoned explanation for the change."  *Encino*, 136 S. Ct. at 2125.  While an agency need not show that a new rule is "better" than the rule it replaced, it still must demonstrate that "it is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates."  *FCC v. Fox*, 556 U.S. at 515.

125.  Moreover, the APA requires that interested parties have a "meaningful opportunity to comment on proposed regulations."  *See Safe Air for Everyone v. U.S. Envtl. Prot. Agency*, 488 F.3d 1088, 1098 (9th Cir. 2007).  To satisfy the requirements of APA section 553, notice of a proposed rule must "provide an accurate picture of the reasoning that has led the agency to the proposed rule," so as to allow an "opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules."  *Connecticut Light & Power*, 673 F.2d at 528-30; *see also Prometheus Radio Project v. Federal Commc'ns. Comm'n*, 652 F.3d 431, 449 (3d Cir. 2011) ("an agency proposing informal rulemaking has an obligation to make its views

known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible") (citations and emphasis omitted).

126.   Here, in promulgating the Final Rules, the Services failed to provide a reasoned analysis for the changes, relied on factors Congress did not intend for them to consider, entirely overlooked important issues at the heart of their species-protection duties under the ESA, and offered explanations that run counter to the evidence before the Services and that fail to address significant deviations from prior agency policy.

127.   With regard to the Habitat Definition Rule, the Services, among other defects:

    a. Failed to provide any reasoned explanation for adding a new definition of "habitat" in 50 C.F.R. § 424.02 that limits critical habitat designations to the area that "currently or periodically contains the resources and conditions necessary to support one or more life processes of a species";

    b. Failed to explain or provide any reasoned justification for changing their position from their prior approach to defining what constitutes habitat for listed species;

    c. Failed to consider the impact of the new definition on listed species and their habitat, including the need to protect and restore areas of currently unoccupied habitat so that species may expand their current ranges or migrate to new territory to avoid existential human and environmental threats such as climate change and habitat destruction; and

    d. Failed to consider how the Services will fulfill the ESA's policy of institutionalized caution and species recovery mandates despite the rule's significant limitations on designation of habitat that is essential to species conservation.

128.   Furthermore, the Services failed to provide a meaningful opportunity to comment on the Habitat Definition Rule, because the definition set forth in the final rule was not included in, and is not a logical outgrowth of, the proposed Habitat Definition Rule.

129.   With regard to the Habitat Exclusion Rule, FWS, among other defects:

    a. Failed to provide any reasoned explanation for its requirement in 50 C.F.R. § 17.90(c)(2) and (e) that FWS must undertake an exclusion analysis when "proponent of excluding a particular area … has presented credible information regarding the

43

existence of a meaningful economic or other relevant impact supporting a benefit of exclusion," and must exclude an area from critical habitat when FWS "determines that the benefits of excluding a particular area from critical habitat outweigh the benefits of specifying that area as part of critical habitat," and failed to consider the impacts to listed species and critical habitat from those changes;

b. Failed to provide any reasoned explanation for its requirement in 50 C.F.R. § 17.90(d) that FWS defer to outside "experts in" or those with "firsthand knowledge of" areas that are "outside of the scope of the [FWS]'s expertise" unless FWS has specific information rebutting that information, failed to provide a reasoned explanation for the omission of any requirement that the FWS consider information from proponents of critical habitat designation, and failed to consider the impacts to listed species and critical habitat from that change;

c. Failed to provide any reasoned explanations for departing from its prior policies—that a critical habitat exclusion analysis is discretionary, not mandatory, and that the FWS generally does not exclude federal lands from designations of critical habitat—when it rendered all federal lands eligible for exclusion;

d. Failed to provide any reasoned explanation for its requirement in 50 C.F.R. § 17.90(d)(4) that, in determining whether to exclude areas covered by conservation plans or agreements, FWS consider "information provided by proponents" of an exclusion, but not proponents of designation, of an area as critical habitat, and failed to consider the impacts to listed species and critical habitat from that change;

e. Failed to consider the impact on listed species and their habitat of excluding additional areas from critical habitat designations and associated protections, including the need for species to recover to prior habitat ranges and to migrate to new territory in response to existential threats including climate change and habitat destruction; and

f.  Failed to consider how the Habitat Exclusion Rule will adversely affect the ESA's policy of institutionalized caution and species recovery mandates given the rule's effect on increasing in areas that will be excluded from critical habitat designations.

130.   Accordingly, the Services acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and failed to follow the procedures required by law, in violation of the APA.  5 U.S.C. §§ 553, 706.  Consequently, the Final Rules should be held unlawful and set aside.

### THIRD CAUSE OF ACTION
#### (Violation of NEPA and the APA;
#### 42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706)

131.   Paragraphs 1 through 130 are realleged and incorporated herein by reference.

132.   NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed activity before acting.  *See* 42 U.S.C. § 4332.  To achieve that purpose, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  *Id.* § 4332(2)(C); 40 C.F.R. § 1502.3.

133.   NEPA's implementing regulations specify several factors that an agency must consider in determining whether an action may significantly affect the environment, thus warranting the preparation of an EIS, including "[t]he degree to which the action may adversely affect an endangered or threatened species or its [critical] habitat" under the ESA.  40 C.F.R. § 1508.27.  The presence of any single significance factor can require the preparation of an EIS. "The agency must prepare an EIS if substantial questions are raised as to whether a project may cause significant environmental impacts."  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir. 2014).

134.   The Final Rules will have significant environmental impacts on imperiled species and their habitat by limiting the number, type, and extent of critical habitat designations and thus reducing the ESA's commensurate protections for endangered and threatened species associated with such designations.  As FWS's own economic analysis for the proposed Habitat Exclusion Rule stated, "[t]he proposed rule is likely to result in additional areas being excluded from future critical habitat designations . . . due to: 1) the additional considerations regarding community impacts and non-federal activities on Federal lands; 2) the clarification for stakeholders regarding what constitutes 'credible information' that will trigger a 4(b)(2) exclusion analysis; and 3) the

provision that the Service will weight information in impacts based on who has the relevant expertise." The reduction in areas considered "habitat" under the Habitat Definition Rule will, in turn, result in fewer areas protected as "critical habitat," which will reduce species' ability to survive and recover, contrary to the fundamental purposes of the ESA.

135. Because of these significant, direct, indirect, and cumulative environmental impacts on imperiled species and their habitat, the NEPA categorical exclusion for policies and regulations of an administrative or procedural nature, 42 C.F.R. § 46.210(j), do not apply.

136. In any event, "extraordinary circumstances," including significant impacts on listed species and critical habitat and violations of the ESA, preclude the application of an exclusion from NEPA review. *See* 43 C.F.R. § 46.215.

137. Consequently, the Final Rules constitute a "major federal action" that significantly affects the quality of the human environment, requiring preparation of an EIS prior to finalization of the rules.

138. Furthermore, NEPA requires that an agency consider the full scope of activities encompassed by its proposed action, as well as any connected, cumulative, and similar actions. *See* 40 C.F.R. § 1508.25. "Connected actions" means actions that "are closely related and therefore should be discussed in the same impact statement." *Id*. § 1508.25(a)(1). Similarly, "cumulative actions" are those "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." *Id*. § 1508.25(a)(2). And "similar actions" are those "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." *Id*. § 1508.25(a)(3). "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014).

139. Here, the Services violated NEPA by failing to consider the combined impacts of the Final Rules, given that both regulations directly impact the critical habitat designation process

1  under Section 4 of the ESA and, whether treated as connected, cumulative, or similar actions, will

2  have significant adverse direct, indirect, and cumulative impacts on endangered and threatened

3  species and their habitat.

4       140.   In sum, the Services' failure to take a "hard look" at the environmental impacts of the

5  Final Rules, and their determination that the Final Rules are subject to a categorical exclusion

6  from NEPA, was arbitrary and capricious, an abuse of discretion, and contrary to the

7  requirements of NEPA and the APA.  5 U.S.C. § 706(2); 42 U.S.C. § 4332(2)(C).  Consequently,

8  the Final Rules should be held unlawful and set aside.

9  **PRAYER FOR RELIEF**

10       WHEREFORE, State Plaintiffs respectfully request that this Court:

11       1.     Issue a declaratory judgment that the Services violated the ESA and APA by acting

12  arbitrarily, capriciously, contrary to law, in abuse of their discretion, and in excess of their

13  statutory jurisdiction and authority in promulgating the Final Rules;

14       2.     Issue a declaratory judgment that the Services violated the APA by acting arbitrarily,

15  capriciously, contrary to law, in abuse of their discretion, and in violation of the public notice

16  procedures required by law in promulgating the Final Rules;

17       3.     Issue a declaratory judgment that the Services violated NEPA and the APA by acting

18  arbitrarily, capriciously, contrary to law, in abuse of their discretion, and in violation of the

19  environmental review and public review procedures required by law in promulgating the Final

20  Rules;

21       4.     Issue an order vacating the Services' unlawful issuance of the Final Rules so that the

22  prior regulatory regimes are immediately reinstated;

23       5.     Issue a mandatory injunction requiring the Services to immediately withdraw the

24  Final Rules and reinstate the prior regulatory regime;

25       6.     Award State Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

26       7.     Award such other relief as the Court deems just and proper.

27

28

Complaint for Declaratory and Injunctive Relief

1    Dated:  January 19, 2021                              Respectfully submitted,

2

3    XAVIER BECERRA                                        MAURA HEALEY
     Attorney General of California                        Attorney General of Massachusetts
     DAVID A. ZONANA
4    Supervising Deputy Attorney General                  /s/ Turner Smith
     DAVID G. ALDERSON                                     TURNER SMITH*
5    Supervising Deputy Attorney General                  MATTHEW IRELAND*
                                                           Assistant Attorneys General
6    /s/ George Torgun                                     Office of the Attorney General
     GEORGE TORGUN, State Bar No. 222085                   Environmental Protection Division
7    TARA MUELLER, State Bar No. 161536                    One Ashburton Place, 18th Floor
     ERIN GANAHL, State Bar No. 248472                     Boston, MA 02108
8    Deputy Attorneys General                              Telephone:  (617) 727-2200
     1515 Clay Street, 20th Floor                          Email:  Turner.Smith@mass.gov
9    P.O. Box 70550
     Oakland, CA  94612-0550                               *Attorneys for Plaintiff*
10   Telephone:  (510) 879-1002                            *Commonwealth of Massachusetts*
     Email:  George.Torgun@doj.ca.gov
11
     *Attorneys for Plaintiff State of California*
12

13

14   BRIAN E. FROSH                                        WILLIAM TONG
     Attorney General of Maryland                          Attorney General of Connecticut

15   /s/ Steven J. Goldstein                               /s/ Matthew I. Levine
     STEVEN J. GOLDSTEIN*                                  MATTHEW I. LEVINE*
16   Special Assistant Attorney General                    DANIEL M. SALTON*
     Office of the Attorney General                        Assistant Attorneys General
17   200 Saint Paul Place, 20th Floor                      Office of the Attorney General of
     Baltimore, Maryland 21202                             Connecticut
18   Telephone:  (410) 576-6414                            165 Capitol Avenue
     Email:  sgoldstein@oag.state.md.us                    Hartford, CT 06106
19                                                         Telephone:  (860) 808-5250
     *Attorneys for Plaintiff State of Maryland*           Email:  Daniel.Salton@ct.gov
20
                                                           *Attorneys for Plaintiff State of Connecticut*
21

22

23

24

25

26

27

28

48

KWAME RAOUL
Attorney General of Illinois

/s/ Jason E. James
JASON E. JAMES*
Assistant Attorney General
MATTHEW J. DUNN*
Chief, Environmental Enf./Asbestos Litig. Div.
Office of the Attorney General,
Environmental Bureau
69 W. Washington St., 18th Floor
Chicago, IL 60602
Telephone:  (312) 814-0660
Email:  jjames@atg.state.il.us

*Attorneys for Plaintiff State of Illinois*

KEITH M. ELLISON
Attorney General of Minnesota

/s/ Peter N. Surdo
PETER N. SURDO*
Special Assistant Attorney General
Minnesota Office of the Attorney General
445 Minnesota Street, Suite 1400
St. Paul MN 55101
Telephone:  (651) 757-1061
Email: peter.surdo@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota*

HECTOR BALDERAS
Attorney General of New Mexico

/s/ William Grantham
WILLIAM GRANTHAM*
Assistant Attorney General
201 Third St. NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 717-3520
E-Mail: wgrantham@nmag.gov

*Attorneys for Plaintiff State of New Mexico*

FOR THE PEOPLE OF THE
STATE OF MICHIGAN

/s/ Nathan A. Gambill
NATHAN A. GAMBILL*
Assistant Attorney General
Environment, Natural Resources,
and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
Telephone:  (517) 335-7664
Email:  gambilln@michigan.gov

*Attorney for Plaintiff the People of the State of Michigan*

GURBIR S. GREWAL
Attorney General of New Jersey

/s/ Lisa Morelli
LISA MORELLI, State Bar 13709
Deputy Attorney General
Environmental Permitting & Counseling
R.J. Hughes Justice Complex
P.O. Box 093
Trenton, NJ 08625
Telephone:  (609) 376-2708
Email: Lisa.Morelli@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

LETITIA JAMES
Attorney General of New York

/s/ Laura Mirman-Heslin
LAURA MIRMAN-HESLIN*
Assistant Attorney General
TIMOTHY HOFFMAN*
Senior Counsel
JENNIFER NALBONE
Environmental Scientist
Office of the Attorney General
Environmental Protection Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
Telephone:  (212) 416-6091
Email:  Laura.Mirman-Heslin@ag.ny.gov

*Attorneys for Plaintiff State of New York*

| | |
|---|---|
| JOSHUA H. STEIN<br>Attorney General of North Carolina | ELLEN F. ROSENBLUM<br>Attorney General of Oregon |
| /s/ Amy L. Bircher<br>AMY L. BIRCHER*<br>Special Deputy Attorney General<br>SCOTT A. CONKLIN*<br>Assistant Attorney General<br>North Carolina Department of Justice<br>114 W. Edenton Street<br>Raleigh, NC 27603<br>Telephone:  (919) 716-6400<br>Email:  abircher@ncdoj.gov<br>Email:  sconklin@ncdoj.gov | /s/ Paul Garrahan<br>PAUL GARRAHAN*<br>Attorney-in-Charge<br>STEVE NOVICK*<br>Special Assistant Attorney General<br>Natural Resources Section<br>Oregon Department of Justice<br>1162 Court Street NE<br>Salem, OR 97301-4096<br>Telephone:  (503) 947-4593<br>Email: Steve.Novick@doj.state.or.us |
| *Attorneys for Plaintiff State of North Carolina* | *Attorneys for Plaintiff State of Oregon* |
| PETER F. NERONHA<br>Attorney General of Rhode Island | JOSH SHAPIRO<br>Attorney General of Pennsylvania |
| /s/ Gregory S. Schultz<br>GREGORY S. SCHULTZ*<br>Special Assistant Attorney General<br>Office of the Attorney General<br>150 South Main Street<br>Providence, RI 02903<br>Telephone:  (401) 274-4400<br>Email:  gschultz@riag.ri.gov | /s/ Aimee D. Thomson<br>AIMEE D. THOMSON*<br>Deputy Attorney General<br>ANN R. JOHNSTON<br>Senior Deputy Attorney General<br>Office of Attorney General<br>1600 Arch Street, Suite 300<br>Philadelphia, PA 19103<br>Telephone:  (267) 940-6696<br>Email:  athomson@attorneygeneral.gov |
| *Attorneys for Plaintiff State of Rhode Island* | *Attorneys for Plaintiff*<br>*Commonwealth of Pennsylvania* |
| ROBERT W. FERGUSON<br>Attorney General of Washington | THOMAS J. DONOVAN, JR.<br>Attorney General of Vermont |
| /s/ William R. Sherman<br>WILLIAM R. SHERMAN*<br>Assistant Attorney General<br>Washington Attorney General's Office Counsel<br>for Environmental Protection<br>800 5th Ave Ste. 2000 TB-14<br>Seattle, Washington 98104-3188<br>Telephone:  (206) 442-4485<br>Email: Bill.Sherman@atg.wa.gov | /s/ Ryan P. Kane<br>RYAN P. KANE*<br>Assistant Attorney General<br>Office of the Attorney General<br>109 State Street<br>Montpelier, VT 05602<br>Telephone:  (802) 828-3171<br>Email:  ryan.kane@vermont.gov |
| *Attorneys for Plaintiff State of Washington* | *Attorneys for Plaintiff State of Vermont* |

Complaint for Declaratory and Injunctive Relief

1

JOSHUA L. KAUL
Attorney General of Wisconsin

2

/s/ Gabe Johnson-Karp

3

GABE JOHNSON-KARP*
Assistant Attorney General

4

Wisconsin Department of Justice
Post Office Box 7857

5

Madison, WI 53707
Telephone: (608) 267-8904

6

Fax: (608) 267-2223
Email: johnsonkarpg@doj.state.wi.us

7

Attorneys for Plaintiff State of Wisconsin

8

JAMES E. JOHNSON
Corporation Counsel
for the City of New York

/s/ Antonia Pereira
ANTONIA PEREIRA*
Assistant Corporation Counsel
New York City Law Department
Environmental Law Division
100 Church Street, Room 6-140
New York, New York 10007
Telephone: (212) 356-2309
Email: anpereir@law.nyc.gov

Attorneys for Plaintiff City of New York

*Application for admission pro hac vice
forthcoming

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief